DAVISON ET AL. v. DAVISON ET AL. ADMRS. OF JOHN DAVISON, DECEASED.

*Certiorari* to Orphans' Court of Monmouth County.

An administrator although entitled to a distributive share of the personal estate of his intestate, may be examined on oath, before the Orphans' Court, or Auditors, to prove that he or his co-administrator was indebted to the intestate.

The Statute of New-Jersey makes no exception on account of the *interest* the administrator may have in the increase of assets, or in his being compelled to testify against himself.

This summary mode is intended to be a substitute for the more expensive remedy by bill of discovery, in Chancery.

## THE CASE.

Richard Davison and Peter Davison, Jun. Administrators of John Davison, deceased, filed their account in the Orphans' Court of Monmouth County, in July Term, 1835. The plaintiffs in *Certiorari*, who together with the administrators, are

children and next of kin of the intestate, excepted to that account. The account and exceptions were referred to auditors. On the hearing before the auditors, the exceptants required Peter Davison, one of the administrators, to be examined under oath, touching the truth and fairness of the account, and particularly in relation to a debt due from Richard Davison, his co-administrator, to the intestate, of six hundred and sixty-six dollars and sixty-six cents, and interest thereon, not included in the inventory filed by the administrators, nor charged to them or to either of them, in the said account. The examination of Peter Davison, was objected, to by the accountants, but the auditors overruled the objection, and Peter Davison was thereupon sworn and examined. Upon his evidence, the auditors re-stated the account, and surcharged the accountants with six hundred and sixty-six dollars and sixty-six cents, of principal, and one hundred and fifty-nine dollars and forty-four cents of interest, for moneys due from Richard Davison to the estate of the intestate.

On the coming in of the report of the auditors, the accountants filed exceptions thereto, and the Court opened the account for a re-hearing. On the re-hearing, the exceptants again required Peter Davison, the administrator, to be examined under oath, touching the said matters, but the Court overruled the application, and refused to permit him to be sworn. The exceptants, then called upon the court, to have Richard Davison, the other administrator, examined under oath, touching the truth and fairness of the account, and his indebtedness as aforesaid to the estate of the intestate, but this application was also overruled by the court, and thereupon the court ordered the said items of six hundred and sixty-six dollars and sixty-six cents of principal and one hundred and fifty-nine dollars and forty-four cents of interest, to be stricken out of the account.

This proceeding on the part of the Orphans' Court, is complained of, as erroneous, and the matter brought here by *Certiorari*, to be reviewed and corrected.

The cause was argued by *Randolph* and *Southard* for the plaintiffs, and by *Ryall* and *Vroom*, for the defendants.

HORNBLOWER, C. J. By the 31st section of the state *Rev.*

*laws*, 786, it is enacted, " That it shall be lawful for the court to whom any account is reported for allowance, or for the auditors to whom an account is referred, at the instance of any party interested in the same, or by their own proper authority, to examine any executor, administrator, guardian, or trustee, exhibiting such account, on oath or affirmation, touching the truth and fairness of the same, or any part or item thereof."

The authority given to the court, by this enactment, is broad and unqualified : they may, either *ex mero motu*, or at the instance of any party in interest, examine the accountant under oath. Nor is it a simple authority, which the court may or may not exercise at their discretion, when called upon to do so, by a party in interest. The words, " it shall be lawful for the court," are equivalent to saying, " the court may ; " and " may " is held to be imperative, where third persons have an interest in the application of the power. (*Newburgh Turnpike Company* v. *Miller*, 5 *Johns. Ch. R.* 112, 113.) In the case of *The King* v. *Barlow*, (2 *Salk.* 609,) the church-wardens were indicted for not making a rate or assessment, under the *Stat.* of 14 *Car.* II. *ch.* 12. *sec.* 18, for the re-imbursement of some constables. The statute says, they " shall have power and authority to make a rate," and it was construed to be peremptory, as the constables had an interest in the exercise of the power. The court of K. B. said in that case, that the word " may " shall be taken to be mandatory, where the thing to be done, is for the sake of *Justice*, or the public good. Surely it is for the sake of Justice, to widows and orphans, that this authority is given to the court. The examination, however, must be a lawful one : it must be, " touching the truth and fairness " of the account in general, or of some part or item thereof; and upon the general inquiry, omissions may be inquired into, as well as the correctness of charges and discharges inserted in the account; and the court must decide upon the legality of the questions propounded to the accountant. Hence, it becomes necessary to inquire what were the matters about which it was proposed to examine these defendants. It was alleged, on the part of the exceptants, that the administrators had not charged themselves, either in the inventory, or account, with a debt due from one of them to the estate of their intestate ; and it was proposed to examine each of them, touching that matter.

The court overruled the application, and refused to permit either of them to be examined.

In support of that decision, it is now argued—1st. That Peter Davison, being himself one of the next of kin, and entitled to a distributive share, could not be examined as a witness, or in any other manner, for the purpose of proving the indebtedness of his brother, and thus increasing the fund for distribution between himself and others: and 2dly. That the court had no right to compel Richard Davison to testify against his own interest. I do not see but these exceptions, if well taken, have repealed the statute: but let us examine them separately; and first, as to Peter. He is an administrator: the Statute says, he may be examined, touching the truth and fairness of the account: but for what purpose? Parties in interest will not be likely to put him under oath for the purpose of shewing errors or omissions, the correction of which, will lessen his liabilities, and decrease the fund: their object will generally be of an opposite character; and by appeals to his own conscience, to charge him more extensively, than he has charged himself; but then comes the objection; you are going to make him swear against his interest. He then is as much protected from this searching operation, as Richard is; for I can see no difference between asking an administrator whether he has given credit for all the assets that have come to his hands, and asking him whether he was not indebted to the intestate at the time of his death. The object of both questions is, to surcharge the account, and increase the fund.

But again: Peter cannot be examined for the purpose of proving the indebtedness of Richard, because he has a direct interest in doing so. Let us see what this leads to. The point of the objection is, that he has an interest in increasing the fund; and if this is a valid objection, I do not see to what matter he may be examined, unless it be for the purpose of *decreasing* the fund. You cannot ask him whether his co-administrator did not receive one hundred dollars belonging to the estate, from A or B, which by design or mistake he has omitted to credit, because that goes to charge his co-administrator, and increase the fund. You cannot ask him whether he did not himself receive moneys belonging to the estate, which he has not credited, because that goes to increase his co-administrator's responsibility to the next of kin,

or to creditors.   For precisely the same reason, you cannot ask any question, or obtain any discovery from one administrator, in the most indirect and incidental manner, the effect of which may be to surcharge their account, or lessen their claims upon the estate; because it increases the responsibility of his co-administrator.

It comes then to this : If there is only one administrator, you cannot examine him for the purpose of surcharging his account, because that is compelling him to swear against his own interest.   If there are two or more administrators, you cannot examine one of them, to prove, or to discover assets in the hands of the other, unaccounted for, because that is not only making one a witness against the other, but increasing the fund out of which, distribution is to be made, and commissions paid.   By this time, the Statute is pretty effectually repealed.   The objections, when followed out in practical application, would go the whole length of doing so.   Suppose Peter had in his possession, or knew who had, the bond or other security, or voucher, given by Richard to the intestate, for the money in question, he could not, if those objections are valid, be enquired of concerning it.   He might say, your object is to charge the administrators with the money, and that will increase my responsibility ; and Richard might interpose and say, you shall not examine Peter concerning that matter, for he has a direct interest in increasing the distributive fund, and cannot be a witness for any such purpose.

But if the Court was right in refusing the examination of Peter, upon the ground of interest, it remains to enquire how their refusal to permit the exceptants to examine Richard himself, touching his indebtedness to the estate, can be justified.   In one part of the argument, we are told, that he could not be compelled to testify or make disclosures against his own interest; but counsel finally admitted, that an administrator might be examined at the instance of an exceptant, for the purpose of charging himself, *as to his receipts and disbursements*.   It cannot be then, on the ground of his not being liable to be examined as to matters against his own interest: for surely he has as much interest, in concealing the amount of assets he has received, or swelling the amount of disbursements he has made, as he has in concealing his own indebtedness to the estate.   They all go di-

rectly to affect his purse.   Besides, a debt due from an adminis-
trator to his intestate, is as truly and legally, *assets in his hands*,
to be administered, as so much money received by him, from any
other debtor.

But after all, the great and conclusive answer to all these ob-
jections is, that the statute wisely subjects administrators to this
ordeal ; and the defendant Richard, has *voluntarily* taken upon
himself that office, and thereby with his eyes open, placed himself
in a situation in which he may be called upon to answer under
oath, as to the accounts and dealings between him and the intes-
tate.   And as the Statute authorizes *every* administrator to be ex-
amined touching all he knows about the estate, and who are its
debtors, and who its creditors, these defendants, by *voluntarily*
associating themselves with each other in this administration,
have exposed themselves to all the developments, that each, not
as witnesses, but as joint accountants, may be compelled to make
under oath, in relation to the situation of the estate.   As to the
effect, or influence the answers are to have upon the rights of the
parties, that is a question for the consideration of the court be-
fore which the account is to be settled.

But the counsel for the defendants rely upon a more plausible
and ingenious argument, drawn from the provisions of the 21st
and 33d sections of the act, (*R. L.* 782 and 787,) by the former
of which, it is enacted among other things, that " wherever dis-
" putes arise, respecting the existence of a will, *the fairness of*
" *an inventory*, or the right of administration, the surrogate
" shall issue citations," &c., and, " the cause shall be heard in
" a summary way, by the Judges of the " (Orphans') " Court,
" subject to an appeal to the Prerogative Court," &c.   And by
the latter of which sections, the remedy by *Certiorari* to this
court, is taken away, in all cases in which an appeal is given
from the Orphans', to the Prerogative court.

The argument is this : that as this debt from Richard to the
intestate, existed at the death of the intestate, it was assets in the
hands of the administrators immediately : that it ought, there-
fore, to have been included in the *inventory ;* and if it was not,
that the exceptants or other parties in interest, ought to have
raised a *dispute* about it *then,* so that citations might have been
issued, and the matter settled by the Orphans' Court, subject to

an appeal to the Prerogative court : that it is now too late, and that if this court hold jurisdiction of the matter, there will be two tribunals exercising a jurisdiction over the inventory.

That the legislature, by the provisions of the 21st section, intended to make the inventory final and conclusive as to the amount of assets, existing at the death of the intestate, unless excepted to, and brought distinctly before the Orphans' Court for adjudication, before the final settlement of the account, is a proposition, I cannot accede to, in the absence of clearer enactments to that effect, than are to be found in the Statute. Inventories are generally made in haste ; in the hour of family affliction and distress : often by those least acquainted with the affairs of the deceased, and when those most deeply interested, the widow and orphans, are ignorant of their rights, or incapable of looking after them. Parties interested in an estate, even if adults, and capable of guarding their rights, seldom think of examining the inventory, and rely upon proper investigations on the final settlement. Nevertheless it was proper to give an opportunity to creditors, legatees and next of kin to object to the inventory, if they were dissatisfied with it, and to provide a tribunal to hear and settle the dispute, without waiting for the final account to come in.

According to the decisions of the court of K. B. the Ecclesiastical Courts have no right, after an inventory has been exhibited, to entertain any objections to it. (2 *Williams on Execrs.* 645, *Phil. ed:* and cases there cited.) But the Prerogative court of Canterbury, and the K. B. are at variance on this point (*Id.* 1265.) ; and without some provision like that in our statute, there would have been no way in which an unfair or insufficient inventory, could have been corrected, however unsatisfactory to parties in interest, until the administrator could be cited to account. I have no doubt, the provision in our statute, was introduced to meet this difficulty ; and I have as little doubt, that if an inventory is excepted to in any particular, and that exception has been heard and finally settled by the Orphans' Court, or on appeal to the Ordinary, it will be conclusive as to that particular upon all parties, and cannot be re-examined into, upon exceptions to the final account. But any matter which has not been the subject of previous adjudication, may be enquired into on the hearing

of the final account, and either added to or deducted from the amount of the inventory, as the truth and justice of the case may require.

My opinion is that the decree of the Orphans' Court must be reversed and set aside, and that the record and account be remitted to that court, to be proceeded upon according to law.

FORD, J. Richard Davison and Peter Davison, Administrators of John Davison, deceased, having in the Orphans' Court of Monmouth county, filed their account, and John Davison and others next of kin to the intestate, having taken exceptions thereto, the account and exceptions were referred to auditors. The intestate in his life-time, was supposed to have lent to his son Richard Davison, one of the administrators, a large sum of money, which was still due and owing at the intestate's death, and it became a principal exception, that this debt was not charged in the account, as assets of the estate. The inventory did not shew it, and at the instance of the parties interested, the auditors examined Peter Davison, one of the administrators, on oath, (though opposed) touching this matter; and on the information so derived from him, charged the administrators for it, to the amount of eight hundred and twenty-six dollars and ten cents. The administrators afterwards took exceptions to the report of the auditors, which brought the same matter to a hearing before the Orphans' Court, when the parties interested, prayed that Peter Davison the administrator, might be examined on oath, to this matter, but the court, after argument, refused the request: and in like manner refused to examine Richard Davison on oath, to this matter; and the court having then no proof of the debt, caused it to be struck out of the account. Upon a *Certiorari* which brings up that decree, there are assigned two principal errors: first, that the court refused to examine Peter Davison on oath; secondly, that they refused to examine Richard Davison.

The 31st *section* of the Act (*Rev. Laws*, 786,) provides: " That it shall be lawful for the Orphans' Court, at the instance of any party interested in the account, or by their own proper authority, to examine any administrator exhibiting such account, on oath or affirmation, touching the truth and fairness of the same."

This examination is in the place of a bill in equity, for discovery, answering the ends of it, yet free from the expenses and delay of one; and in every view should be fully supported; but at the same time ought never to be perverted. Now, suppose Peter Davison *believed* or even *knew* of the money being lent by the intestate in his life-time, to Richard Davison; but had neither voucher nor witness by whom it could be proved, it would be no legal ground for charging the money to either of them.— It could justify no charge against Peter, for assets that never came to his hands; neither could he be chargeable on a *devastavit*, for neglecting to collect a debt of which there was no sufficient evidence. For though he might know of the lending, and be willing to swear to the fact, yet being one of the children, and necessarily interested to increase the estate, it would preclude him from being a competent witness on this point, either at law or in equity. I am therefore of opinion, that the court committed no error in refusing to examine Peter Davison to *this matter*.

But the case is different with respect to Richard Davison. If he owed the intestate, at his death, a just debt, it was as much assets of the estate, as a debt owing by any other person; and if he had obtained a loan of money, giving no bond, note, or other evidence of it, he might have been compelled to disclose the fact upon oath, on a bill in equity, for discovery; and if he confessed the fact, he would have been decreed to account for it as assets in his hands. But without any of the delay or expenses of a bill in Chancery, the legislature saw that the conscience of an administrator could be tested in an examination on oath, as well before the Orphans' Court, or their auditors, as before the Chancellor or masters of that court, and therefore they added a section for the purpose. What he discloses being taken together, the court could judge whether it established an existing debt or not. If it did so, the debt would be assets in the hands of that administrator, and consequently would be a charge against both of them, as between them and the Ordinary. The appointment gives them a joint office, in which they are bound for one another, to him, to account for all assets that may come to either of their hands; and it is their own undertaking, for the performance whereof, they gave joint security. If one administrator becomes fearful of the other, he may, as between themselves, cite his com-

panion to account in the Orphans' Court *to him,* and give security for that part of the assets which came to his hands; but this matter is between themselves. They are both accountable to the Ordinary, for what either has received of the estate.

But it is inquired whether we have any jurisdiction by *Certiorari,* of this matter, supposing there has been an error below; for it relates entirely to the truth and fairness of an inventory; which is to be decided by the surrogate or the Orphans' Court, subject (*Rev. Laws,* 782, *sec.* 21.) to an appeal to the Prerogative ·Court; and where an appeal is given, no *Certiorari* (by the 33d *section*) will lie. And by the same section an appeal from the proceedings of the surrogate, must be made within six months after such proceedings. Now when the surrogate files an inventory, his proceeding in relation to the paper, is closed; he becomes *functus officio,* and the document belongs to the court. If the truth and fairness of it cannot be inquired into after six months, what is to be the fate of orphans, who had not then attained the age of discretion, perhaps did not know their right hand from their left? The answer is, that no dispute as to the inventory, had then *arisen.* The same section provides, that *whenever* the dispute shall *arise,* respecting the fairness of an inventory, (*whenever* means without regard to time) it shall be heard in the Orphans' Court; now it never arose till the time of final settlement; and the final settlement is reviewable here on *Certiorari.* The Orphans' Court may inquire into the fairness of an inventory, under this clause in the statute, *whenever* the question shall arise. And this construction receives from the 20th *section,* full corroboration, for it provides, that when an account is reported for allowance, the administrator may *then* be examined on oath, "touching the truth and fairness of the *account,* and of *evrey* part and *item* thereof." Now the inventory is a part and item in every account, and by the terms of the statute, Richard Davison should have been examined by the court, on that final settlement, touching the truth and fairness of every item in the account, if the parties. interested required it to be done; and their refusal to do so, was an error that must occasion a reversal of the decree.

DAYTON, J. The 31st sec. of the act upon this subject, *Rev. L.* 786, gives the Court full power at the instance of any party interested, to examine the administrator on oath or affirmation, touching the truth and fairness of his account, or any part or item thereof. Whether this section of the act, is to be so construed as to give the Court, merely the power of purging the conscience of the administrator, as to all acts done or omitted to be done by him : or, whether it is to be extended so far as to render one administrator a competent witness against his co-administrator, to prove the existence of a debt to the intestate, which if recovered, he will in whole or in part, put into his own pocket, as next of kin, is the question.

It is a safe rule of construction, that where a statute gives a new authority, or introduces new rules of proceeding, we are not to suppose the legislature intended a departure from fixed principles, further than is clearly shown : and if the language of this act, can be fairly satisfied by the more limited construction, such ought to be given to it. A power to examine and purge the conscience of the administrator, as to the mode in which he has acquitted himself of his trust, is perhaps necessary for the attainment of justice ; and has its origin and analogies in courts proceeding, (as the Orphans' Court does) according to the rules of the Civil or Canon law. But to render a party a competent witness, to conclude his co-administrator upon a question of this kind, where the whole amount recovered, may be coming directly to himself, would be a most dangerous principle, and one which I seriously doubt whether the statute in question ever intended to introduce. Cases innumerable may be imagined, where such a principle might be made an instrument in the perpetration of the most fearful frauds. But the Court not only refused to examine Peter Davison, but likewise refused to examine Richard himself, and in this I think, there was error.

I. The purpose and object of the act was, as I apprehend, to probe the conscience of the accounting officer. A debt due from him to the estate, has been held assets in hand, so far as to bring the debt within the jurisdiction of the Orphans' Court. *Wood* v. *Executors of Tallman, Coxe R.* 155. And there can be no objection in principle to so construing the act, as to make the administrator answer on oath, as to the existence or non-existence

Davison et al. v. Davison's admrs.

of such debt.    At Common law, it may be true, that no man is compelled to testify in his own case; but the rules of proceeding in the Orphans' Court, are more analogous to the practice of the Court of Chancery, where this is often done.    Besides, he cannot properly complain of an infringement of his personal rights, for he voluntarily accepts the office of administrator, with his eyes open to all his legal responsibilities; *volenti non fit injuria.*    Nor can it be complained of, as a great hardship, if the administrator be honest; for when called upon to testify as to the fact of his indebtedness, he is really permitted to judge, and testify in his own case.

II.    The fact that Richard himself was not offered as a witness before the auditors, does not affect the question.    The Orphans' Court has as much right to hear evidence and examine vouchers not offered before the auditors, as the auditors had to hear evidence or to examine vouchers not offered before the surrogate.    It does not sit as a Court of error merely, but reviews the whole law and facts of the case embraced within the scope of the exceptions filed.    It does not merely reverse the previous proceedings, and send the same back, but takes original cognizance of the matter, and re-states the account.

It was argued ingeniously, and with much plausibility, that this Court has no jurisdiction of this question; that objection should have been taken at the time of filing the inventory, when the matter would have gone up on appeal to the Ordinary.    That it *might* have been so done, is most true.    But many reasons may exist, why it was not so done.    The next of kin may have been minors—insane—out of the country, and their rights should certainly not be lost or compromised.    The practice has been universal for the Orphans' Court, on the final settlement of accounts, to add to the debit side thereof, all moneys received or debts ascertained subsequent to the date of the inventory.    And sound policy requires that the practice be adhered to.

WHITE and NEVIUS, Justices, concurred with the Ch. Justice.
*Decree reversed, and account remitted to the Orphans' Court.*